UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

AKINYELE C.,[1]

   Plaintiff,

v.           Civil Action No. 4:22-cv-62

KILOLO KIJAKAZI,
*Acting Commissioner of*
*Social Security,*

   Defendant.

## REPORT AND RECOMMENDATION

Plaintiff Akinyele C. seeks judicial review of the Commissioner of Social Security's denial of his claim for disability benefits ("DIB") and supplemental security income benefits ("SSI") under the Social Security Act ("the Act"). Specifically, Plaintiff argues that the Commissioner's Administrative Law Judge ("ALJ") failed to consider Plaintiff's mental health limitations when crafting Plaintiff's residual functional capacity ("RFC") and improperly evaluated medical opinion evidence from Plaintiff's psychiatric treating provider. This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C.

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

§§ 636(b)(1)(B) and (C), and Rule 72(b) of the Federal Rules of Civil Procedure.   This Report concludes the ALJ adequately considered Plaintiff's mental health limitations and the medical opinion evidence, and therefore recommends that the court grant the Commissioner's motion for summary judgment and affirm the final decision of the Commissioner.

## I.   PROCEDURAL BACKGROUND

Plaintiff protectively filed for DIB under Title II of the Act, and for SSI under Title XVI of the Act, on March 25, 2020. (R. 217-34).   He alleged disability beginning April 23, 2016,[2] based on major depressive disorder, anxiety disorder, adjustment disorder, alcohol dependence, high blood pressure, and insomnia. (R. 262).   The state agency denied his application initially and on reconsideration.   (R. 77-98, 103-24).   Plaintiff then requested an administrative hearing.   (R. 156-57).   The hearing was held on August 2, 2021.   (R. 40-76).   Counsel represented Plaintiff at the hearing, and an impartial vocational expert ("VE") testified.   Id. On August 16, 2021, the ALJ denied Plaintiff's claims for DIB and SSI, finding he was not disabled during the period alleged.   (R. 22-34).   The ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the

---

[2] At the administrative hearing on August 2, 2021, Plaintiff asked the ALJ to amend the alleged onset date to July 23, 2019.   (R. 44-46).

severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.   (R. 25-27).   The ALJ also found that Plaintiff's RFC permitted him to perform work within the national economy.   (R. 32-33).   On March 22, 2022, the Appeals Council denied Plaintiff's request for review.   (R. 6-8).

On May 23, 2022, Plaintiff filed his complaint in this court. Compl.   (ECF No. 1).   He seeks judicial review of the Commissioner's final decision that he was not disabled, claiming that "[t]he agency committed error of law by denying Appeals Council review" and that "the conclusions and findings of fact of the [Commissioner] are not supported by substantial evidence and are contrary to law and regulation."   Id. ¶¶ 4, 8 (ECF No. 1, at 2).   On September 6, 2022, Plaintiff moved for summary judgment. (ECF No. 13).

Plaintiff argues that the case should be reversed or remanded because the ALJ "failed to consider [his] mental health limitations in the RFC."   Pl.'s Mem. Supp. Mot. Summ. J. ("Pl.'s Mem.") (ECF No. 14, at 5-8).   Plaintiff also contends that the ALJ "improperly evaluated the medical opinion of Jennifer Morrison, PA-C, Plaintiff's treating psychiatric provider."   Id. at 8-13.   On October 6, 2022, the Commissioner opposed Plaintiff's motion and moved for summary judgment.   (ECF No. 19).   The Commissioner argues that the ALJ "fully accounted for Plaintiff's mental health limitations that were supported by the record" and "appropriately

found PA-C Morrison's opinion unpersuasive." Mem. Supp. Def.'s Mot. Summ. J. & Opp'n Pl.'s Mot. Summ. J. ("Def.'s Opp'n") (ECF No. 20, at 2). After a review of the record, this Report considers each of these arguments.

## II.  FACTUAL BACKGROUND

Plaintiff was born on February 7, 1972, and at the time of the ALJ's decision, he was 49 years old. (R. 32). He met the insured status requirements under the Act until December 31, 2021. (R. 24). He has not engaged in substantial gainful activity since April 23, 2016, the alleged onset date. (R. 25). He has a tenth-grade education and reported past work as a construction worker. (R. 49-55).

### A.  Plaintiff's Health Treatment

Plaintiff's arguments in this court do not require a complete review of his medical history, as he disputes only the ALJ's assessment of his mental health limitations and medical opinions relevant to those limitations. The mental health treatment Plaintiff received, as relevant to the instant motions, is outlined below.

#### 1.  Emergency Hospital Treatment

In the early morning hours of July 17, 2019, Plaintiff presented at Riverside Regional Medical Center with an alcohol problem. (R. 353-54). He reported drinking "all the way around the clock" and estimated that he consumed approximately 15 beers

4

per day for the past eight months.  Id.  He also reported tremors and palpitations when he did not drink.  (R. 354).  The examining physician, Gary S. Kavit, M.D., observed edema in both of Plaintiff's lower extremities, but otherwise noted normal physical examination findings.  (R. 355-56).  Dr. Kavit diagnosed Plaintiff with chronic alcoholism and alcohol withdrawal syndrome with complication.  (R. 357).  Plaintiff was discharged a few hours after he arrived.  Id.

On the evening of that same day, Plaintiff presented at the emergency department of Sentara CarePlex Hospital with a chief complaint of alcohol detox.  (R. 322-23).  Bruce A. Kaczmarek, M.D. conducted a physical examination and observed edema in both of Plaintiffs legs and tremors, but otherwise noted normal physical examination findings.  (R. 324).  Plaintiff also met with Stephanie Lee, a social worker from the Hampton Newport News Community Service Board, and reported depression stemming from the loss of his job and other social consequences related to his excessive alcohol consumption.  (R.  323, 366).  Plaintiff remained in the hospital overnight and was transferred to the Hampton Regional Crisis Stabilization Unit ("RCSU") the following morning for voluntary inpatient psychiatric hospitalization.  (R.  327-31, 371).

### 2.   Hampton Regional Crisis Stabilization Unit

Plaintiff arrived at the RCSU on July 18, 2019.  (R. 367).
Melody Blanco, a nurse practitioner, conducted a physical
examination and observed hand tremors but otherwise noted normal
findings.  (R. 373).  She diagnosed Plaintiff with major depressive
disorder and alcohol dependence.  (R. 372).

The next day, Plaintiff underwent a psychiatric evaluation
with Ajay Kuchibhatla, M.D.  (R. 383-84).  He reported "significant
anxiety and struggles to function because of anxiety," as well as
"difficulty with drinking alcohol," including "cravings and shakes
if he does not drink for a day or two."  (R. 383).  However,
Plaintiff also reported that he thought he "had a good control on
his alcohol."  Id.  He said his sleep, appetite, and energy levels
were fine, and he denied experiencing mania, hypomania,
hallucinations, delusions, feelings of hopelessness or
worthlessness, suicidal or homicidal ideations, and changes in
weight.  Id.  Dr. Kuchibhatla noted that Plaintiff presented "not
very depressed" and said "I don't feel that bad now."  Id.

On mental examination, Dr. Kuchibhatla found Plaintiff to be
alert, oriented, pleasant, and cooperative.  (R. 384).  His hair
was "somewhat unkempt," but he appeared to have "okay hygiene" and
maintained good eye contact throughout the appointment.  Id.  Dr.
Kuchibhatla noted that Plaintiff had normal speech, linear and
goal-directed thought processes, and normal thought content.  Id.

His insight, judgment, and impulse control were fair, and his memory was intact. _Id._ Plaintiff said he was "feeling okay now," and his affect was reactive and congruent with his mood. _Id._ Dr. Kuchibhatla found no evidence of suicidal or homicidal ideations, paranoia, hallucinations, or delusions. _Id._ He diagnosed Plaintiff with severe alcohol use disorder and anxiety disorder and ruled out alcohol-induced depressive disorder.[3] _Id._

Dr. Kuchibhatla met with Plaintiff again on July 20 and 21, 2019. (R. 395-96, 405-06). At each of these appointments, Plaintiff reported feeling well and improved. (R. 395, 405). He said his anxiety seemed much better, and he denied feeling depressed, having violent ideations, or hallucinating. _Id._ At that time, he was not showing any significant withdrawal symptoms. _Id._ On mental examination, Dr. Kuchibhatla noted that Plaintiff described his mood as "feeling better," but otherwise made the same findings and diagnoses as were made at Plaintiff's initial appointment. (R. 395-96, 405-06). To help Plaintiff manage his anxiety, Dr. Kuchibhatla put Plaintiff on Zoloft, to be taken once daily in a 50-milligram dose. (R. 396, 406).

---

[3] Dr. Kuchibhatla's diagnosis states "Rule _our_ Alcohol-Induced Depressive Disorder." (R. 384) (emphasis added). The court interprets this as a typographical error based on Dr. Kuchibhatla's subsequent mental evaluations of Plaintiff, which state "Rule _out_ Alcohol-Induced Depressive Disorder." _See_ (R. 396, 406) (emphasis added).

For the next two days, Luis Posadas, M.D. took charge of Plaintiff's mental evaluations. (R. 410-11, 416-17). On July 22, 2019, Dr. Posadas noted that Plaintiff was tolerating the Zoloft well and that he was no longer demonstrating acute withdrawal symptoms. (R. 410). On mental examination, Dr. Posadas found Plaintiff to be alert, oriented, and cooperative with good eye contact. Id. He also found Plaintiff's insight, judgment, and memory to be fair. Id. His motor skills, thought processes, and speech were normal. Id. Dr. Posadas noted that Plaintiff described his mood as "better," and that his affect was "subdued, but not sad." Id. Plaintiff denied having violent ideations and psychotic symptoms. Id. Dr. Posadas diagnosed Plaintiff with social anxiety, severe alcohol use disorder, and alcohol-induced mood disorder. (R. 411). On July 23, 2019, Dr. Posadas made nearly identical findings and diagnoses on mental examination. (R. 416-17). He then discharged Plaintiff from the RCSU. (R. 417, 421-24).

After discharge, Plaintiff continued to receive outpatient psychiatric treatment from the RCSU. On August 2, 2019, Plaintiff met with nurse practitioner Saphia Beckles for a follow-up appointment. (R. 424-26). Plaintiff claimed he had been in a "good" mood since his discharge from the RCSU and was not experiencing anxiety or depression. (R. 425). He attributed the improvement to taking Zoloft and not drinking. Id. He also denied

sadness, loss of interest, feelings of hopelessness, concentration problems, fatigue, and suicidal ideation. Id. Beckles noted that there were no active signs of withdrawal. Id. She completed a mental examination and found Plaintiff to be clean, alert, oriented, calm, and cooperative with good eye contact. Id. Plaintiff's speech was normal, and his insight and judgment were fair. Id. His thought processes were logical and goal-directed, and his thought content was free of violent ideations, delusions, and hallucinations. Id.

Beckles met with Plaintiff again for another follow-up appointment on August 30, 2019. (R. 431–32). Plaintiff reported successful maintenance of his anxiety and denied having "depressive symptoms." (R. 431). He also expressed satisfaction with his progress and Zoloft, which he found "effective at managing some of his anxiety." Id. Plaintiff described his mood as "okay" and said he had been attending AA meetings and a family and childcare program. Id. Beckles' mental examination findings were nearly identical to those made at Plaintiff's prior follow-up appointment. (R. 432).

On November 22, 2019, Plaintiff was seen by Faisal Mohsin, M.D. (R. 437). Plaintiff reported that things were "going well" but disclosed sleeping problems and asked to increase his daily dosage of Zoloft because he felt the medication was no longer having the same effect. Id. He claimed to be "drinking 'here and

there' but not like before," although Dr. Mohsin noted his suspicion that Plaintiff "[was] drinking more than he is acknowledging." Id. Plaintiff also said he was going to AA meetings twice per week and classes with Child Family Services. Id. Dr. Mohsin conducted a mental examination and noted that Plaintiff was "[a] little animated" but otherwise had a calm mood, normal speech, and goal-directed thought processes. Id. Plaintiff declined new medication for his alcohol use disorder, stating that "I think I have controlled [sic] over it." Id. Dr. Mohsin increased Plaintiff's daily Zoloft dosage to 75-milligrams and put him on trazodone, to be taken once daily in a 50-milligram dose. Id.

On April 6, 2020, Plaintiff had a telehealth appointment with Dr. Mohsin and reported "staying depressed lately" and drinking "about three to four beers some days." (R. 441). He also restated his problems with sleeping and his concerns that his medication was no longer effective. Id. On mental examination, Dr. Mohsin noted that Plaintiff's "focus was on his disability application." Id. Dr. Mohsin increased Plaintiff's Zoloft dosage to 100 milligrams and his trazodone dosage to 150 milligrams. Id.

Plaintiff met with Dr. Mohsin for the final time on May 20, 2020. (R. 446). At that appointment, Plaintiff reported being sober "for about three or four months," — which Dr. Mohsin believed to be an exaggeration — and claimed for the first time that he had

cirrhosis of the liver.  Id.  He said the "combination of Zoloft and trazodone has really helped him with his moods and sleep." Id.  On mental examination, Dr. Mohsin again made normal findings in relation to Plaintiff's speech and thought processes.  Id.

### 3.  Coastal Medical Psychiatric Services

Plaintiff began treatment with Jennifer Morrison, PA-C at Coastal Medical Psychiatric Services on July 28, 2020.  (R. 455–61).  At his initial appointment, Plaintiff reported excessive worrying, difficulty being around people, sleeping problems, isolation, and low motivation.  (R. 459).  He also expressed concern that his trazodone and Zoloft prescriptions were not helping his depression and anxiety.  Id.  Plaintiff denied having hallucinations, violent ideations, or cravings to drink.  Id.

Morrison conducted a mental examination and found Plaintiff to be alert and oriented with good eye contact.  (R. 460).  She concluded Plaintiff had a good fund of knowledge and was of average intelligence.  Id.  His speech was normal, and his thought processes were goal-directed.  Id.  Morrison found no evidence of violent ideations, hallucinations, or delusions.  Id.  Plaintiff's mood was depressed and anxious, and his affect was in congruence with that mood.  Id.  Morrison found Plaintiff's concentration and attention span to be "impaired," but found his immediate recall ability, short-term memory, long-term memory, and judgment to be "intact."  Id.  She diagnosed Plaintiff with severe major

depressive disorder, generalized anxiety disorder, and alcohol dependence (in remission). Id. Morrison also switched Plaintiff's medications from trazodone and Zoloft to Lexapro and Doxepin, which she prescribed in daily doses of 10 milligrams and 25 to 50 milligrams, respectively. (R. 461).

Morrison subsequently re-examined Plaintiff at seven appointments spanning from August 2020 to June 2021. At his appointment on August 20, 2020, Plaintiff reported "an improvement in his mood with the addition of the Lexapro" and that he was "sleeping better with a combination of the Doxepin and not watching TV in bed." (R. 486). He also denied violent ideations and cravings for alcohol. Id. However, he said he was still having persistent problems with worrying. Id. Morrison made the same mental examination findings and diagnoses as were made at Plaintiff's initial appointment in July 2020. (R. 486–87). She listed his functional status as "improving" and increased his daily Lexapro dosage to 20 milligrams. (R. 487).

On September 17, 2020, Plaintiff reported feeling calmer, being more motivated, and having higher energy levels following the increase in his Lexapro dosage. (R. 483). He also said his worrying problem was getting "a little better" and that his mood improved when he tried to exercise regularly. Id. Plaintiff denied violent ideations and cravings for alcohol. Id. On mental examination, Morrison again made similar findings and diagnoses as

12

before, with the only differences being that Plaintiff's mood was "mildly anxious" and his attention and concentration span was "improved." (R. 483-84). Morrison again described Plaintiff's functional status as "improving." (R. 484).

At his next appointment on November 17, 2020, Plaintiff complained that his medication was no longer working. (R. 480). He reported decreases in motivation and energy, feeling more nervous, and sleeping problems. Id. He again denied having violent ideations and cravings for alcohol. Id. Morrison's mental examination findings largely aligned with those from the previous appointment, with the only difference being that Plaintiff now exhibited a depressed and anxious mood. (R. 480-81). Her diagnoses were also largely similar to those previously made, although she downgraded Plaintiff's major depressive disorder diagnosis from severe to "moderate." (R. 481). Morrison increased Plaintiff's Lexapro and Doxepin dosages and listed Plaintiff's functional status as "worsening." Id.

On January 11, 2021, Plaintiff reported that "the higher dose of Lexapro ha[d] helped with his depression and anxiety." (R. 477). He denied having violent ideations and cravings for alcohol. Id. Morrison stated that Plaintiff "still has occasional worrying and concentration problems, but overall has been improved with the medication." Id. She noted that his mood was "mildly anxious" but otherwise made the same mental examination findings and

13

diagnoses as were made at the previous appointment.  (R. 477-78).
Morrison changed Plaintiff's functional status back to
"improving."  (R. 478).

At Plaintiff's next appointment on March 23, 2021, he reported
that the Lexapro was helping with his mood and anxiety, but that
he nonetheless "continue[d] to feel sad at times."  (R. 474).  He
also said he had been isolating himself and had an increased
appetite.  Id.  Plaintiff again reported problems with sleeping
due to excessive worrying at night, despite taking Doxepin.  Id.
He said he "fel[t] like he cannot function" due to his lack of
sleep.  Id.  He denied having violent ideations and cravings for
alcohol, other than having a few drinks to celebrate a family
member's engagement.  Id.  Morrison noted that Plaintiff's mood
was mildly anxious and depressed, and changed his functional status
to "worsening."  (R. 475).  She otherwise made the same mental
examination findings and diagnoses as before.  (R. 474-75).  She
ordered him to stop taking Doxepin and start taking Seroquel.  (R.
475).

On April 26, 2021, Plaintiff reported that he was sleeping
better while taking the Seroquel and felt the Lexapro was helping
with his depression and anxiety.  (R. 471).  He said he was able
to focus most of the time but struggled to maintain attention when
he was stressed or rushing.  Id.  He also continued to deny having
violent ideations or cravings for alcohol.  Id.  On mental

14

examination, Morrison once again made the same findings and diagnoses as before and noted that Plaintiff's functional status showed "slight improvement."   (R. 471-72).

Plaintiff met with Morrison for the final time on June 4, 2021.  (R. 468-70).  Plaintiff said he had been feeling "rough" for the past month.   (R. 468).   He claimed to experience "intermittent episodes of anxiousness/worrying over things excessively," but felt fine once the episodes passed.  Id.   He also reported more problems with sleeping, claiming that "some nights he falls asleep with no problems [but] [o]ther nights he felt like he couldn't fall asleep at all even with the Seroquel." Id.  Plaintiff complained of increased fatigue during the day which was negatively affecting his ability to concentrate.  Id.  Morrison downgraded Plaintiff's functional status to "worsening" but nonetheless made the same mental examination findings and diagnoses as before.  (R. 468-69).  She ordered Plaintiff to slowly stop taking Lexapro over the next three weeks, while slowly starting to take Trintellix over that same timespan.  (R. 469).

**B.  Opinion Evidence**

**1.   State Agency Consultative Examiners**

**a.   Howard Leizer, Ph.D.**

On May 28, 2020, when Plaintiff's claims for DIB and SSI were pending at the initial level, state agency psychologist Howard Leizer, Ph.D. conducted a review of Plaintiff's medical records.

(R. 81–85, 92–96). He opined that Plaintiff had mild limitations in understanding, remembering, or applying information; moderate limitations interacting with others; moderate limitations in concentrating, persisting, or maintaining pace; and mild limitations in adapting or managing himself. (R. 82, 93). Dr. Leizer formed a mental RFC accounting for these limitations and concluded that Plaintiff "could reasonably fulfill simple work" with such restrictions. (R. 83–85, 94–96).

### b.   Sreeja Kadakkal, M.D.

On September 23, 2020, when Plaintiff's claims for DIB and SSI were pending at the reconsideration level, state agency psychiatrist Sreeja Kadakkal, M.D. conducted a review of Plaintiff's medical records. (R. 107–11, 118–22). Like Dr. Leizer at the initial level, Dr. Kadakkal opined that Plaintiff had mild limitations in understanding, remembering, or applying information; moderate limitations interacting with others; moderate limitations in concentrating, persisting, or maintaining pace; and mild limitations in adapting or managing himself. (R. 108, 119). Dr. Kadakkal formed a mental RFC accounting for these limitations and concluded that Plaintiff "would be capable of simple-repetitive work" with such restrictions. (R. 111, 122).

2.   **Plaintiff's Treating Providers**

a.   **Jennifer Morrison, PA-C**

During Plaintiff's March 23, 2021, appointment at Coastal Medical Psychiatric Services, Morrison completed a medical source statement, which is a checkbox form listing certain questions about Plaintiff's work capabilities.   (R. 465).  She diagnosed Plaintiff with major depressive disorder, generalized anxiety disorder, and chronic pain.   Id.   She noted that Plaintiff experienced the following symptoms: anhedonia; appetite disturbance; sleep disturbance; blunt, flat, or inappropriate affect; feelings of guilt or worthlessness; disturbed mood; decreased energy; malaise; difficulty with focus and concentration; isolation and emotional withdrawal; persistent anxiety; and anxiety attacks.  Id.  Morrison opined that, because of Plaintiff's condition, he would experience a "marked" level of impairment when carrying out short or simple instructions; getting along with the general public, co-workers, and supervisors; and responding to changes in routine.[4]  Id.  She further opined that, because of his condition, Plaintiff would experience an "extreme" level of impairment when attempting to maintain concentration or focus, perform at a consistent pace, and deal with normal work stress.   Id.   Morrison estimated that

---

[4] The medical source statement allowed the physician to indicate the "level of impairment" for each activity, with the following checkbox options: none, mild, moderate, marked, and extreme.  (R. 465).

Plaintiff would need to miss four or more days of work per month due to his condition.  Id.

## C.   Testimony Before the ALJ

At the hearing on August 2, 2021, the ALJ heard testimony from Plaintiff and impartial VE, Herman Bates.  (R. 42-76).

### 1.   Plaintiff's Testimony

On direct questioning by the ALJ, Plaintiff testified that he was single, had one adult child, and lived with his mother.  (R. 47).  He claimed that he had not had a driver's license since 2015 and that his mother was his primary form of transportation.  (R. 47-48).  He said he completed the tenth grade and could read, but that he struggled to maintain focus while reading and experienced worry when performing simple calculations with money.  (R. 49-50, 68-69).  Plaintiff testified that he worked for Sunbelt Rentals as a scaffold constructor for over ten years — a job that required lifting weights of around 40 pounds — but voluntarily quit because he was scared of heights.  (R. 50-53).  He also testified that he worked for a temp service in 2019 that dispatched him to various construction jobs, but that it "didn't work out" because of his anxiety and repeated instances of his legs giving out.  (R. 53-54).

Plaintiff testified that he dresses and bathes daily without assistance.  (R. 62).  He claimed that he does not have any hobbies but looks for "little" things to keep himself busy during the day,

like taking out the trash, sweeping his room, or talking with his mother. (R. 58, 61). He denied watching TV or using the internet on a regular basis but said he will occasionally look at the news or get on Facebook. Id. Plaintiff testified that he struggles to exercise because he gets tired. (R. 62). However, he also testified that a friend drives him to a park or beach approximately once per week to sit outside or walk around, which helps relax him. (R. 59-61). Plaintiff said the same friend does his laundry because he cannot concentrate well enough or remember how to do it himself. (R. 63-64). Plaintiff stated that he cooks something little "every now and then," but that his mother cooks the bigger meals and handles all of the grocery shopping for the house. (R. 59-60).

In regard to his alcohol abuse, Plaintiff testified that he had stopped drinking around 2018 and that he attends therapy once a month. (R. 55-56). He said he takes Seroquel, Trintellix, and a third medication[5] daily. (R. 56). He reported struggling to sleep through the night, and that he hadn't slept four to five hours at one time in around four years. (R. 56-57). He said he stays in his room and avoids social interaction because he gets nervous and "can't function" around people. (R. 61-62, 66-68).

---

[5] Plaintiff indicated that he could not pronounce the name of the third medication, calling it "alexaprozam." (R. 56).

He also claimed that his memory and concentration are "gone."  (R. 64).  Throughout his testimony, Plaintiff frequently described his day-to-day life as "miserable."  (R. 58, 61, 69–71).

### 2.   Testimony from VE Bates

Herman Bates is an impartial VE.  (R. 72–73).  At the hearing, the ALJ's hypothetical posited a person with the same age, education, and work experience as Plaintiff who was capable of "light work" with the following limitations:

> [T]he person could perform simple, routine, repetitive tasks not at a production pace rate, meaning no assembly line type work, other people's production is not dependent on the claimant's production, and there would be no periods of fast-paced work.  And the hypothetical individual could also only have occasional contact with supervisors, coworkers, and the public.

(R. 74).  The VE testified that the following "light" jobs would be available to such a person:  small products assembler II (DOT 739.687-030) with 19,000 jobs nationally, merchandise marker (DOT 209.587-034) with 129,000 jobs nationally, and photocopy machine operator (DOT 207.685-014) with 25,000 jobs nationally.  Id.  In response to the ALJ's follow-up questions, the VE testified that the listed jobs would tolerate an employee being off task "[n]o more than 15%" of the time and being absent "[n]o more than two days per month."  (R. 75).

### III. <u>STANDARD OF REVIEW</u>

In reviewing a decision of the Commissioner denying benefits, the court is limited to determining whether the decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001); <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consol. Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but the evidence may be somewhat less than a preponderance. <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966).

The court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996); <u>Hays</u>, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." <u>Craig</u>, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. <u>Perales</u>, 402 U.S. at 390; <u>see</u>

also Lewis v. Berryhill, 858 F.3d 858, 868 (4th Cir. 2017). Ultimately, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## IV.  ANALYSIS

Plaintiff's brief identifies two errors in the ALJ's decision that he claims warrant remand.  First, he argues that the ALJ "failed to consider Plaintiff's mental health limitations in the RFC."  Pl.'s Mem. (ECF No. 14, at 5-8).  Plaintiff also contends that the ALJ "improperly evaluated the medical opinion of Jennifer Morrison, PA-C, Plaintiff's treating psychiatric provider."  Id. at 8-13.  The Commissioner argues that the ALJ "fully accounted for Plaintiff's mental health limitations that were supported by the record" and "appropriately evaluated the opinion evidence in compliance with the agency's regulations."  Def.'s Opp'n (ECF No. 20, at 12-23).  As explained below, this Report finds that the ALJ adequately evaluated Plaintiff's mental health limitations and the medical opinion evidence in the record.  Accordingly, this Report concludes that remand is not warranted, and therefore recommends that the court affirm the Commissioner's decision.

## A.   Framework for SSA Disability Evaluation

A person may file for and receive disability insurance benefits under the Social Security Act if he or she meets the

insured status requirements of 42 U.S.C. § 423(c)(1), is under the retirement age as defined in § 416 of the Act, and is under a disability as defined in § 423(d).   As relevant here, the Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A); accord 20 C.F.R. § 404.1505(a).   An impairment renders an individual disabled only if it is so severe as to prevent the person from engaging in his or her prior work or any other substantial gainful activity that exists in the national economy.   See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1505(a).

SSA regulations set out a sequential analysis which ALJs use to make their determination.   20 C.F.R. § 404.1520(a)(4). Specifically, the regulations direct the ALJ to answer the following five questions:

1.   Is the individual involved in substantial gainful activity?

2.   Does the individual suffer from a severe impairment or a combination of impairments that meets the durational requirement and significantly limits his or her physical or mental ability to do basic work activities?

3.   Does the individual suffer from an impairment(s) that meets or equals a listing in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (a "listed impairment") and meets the durational requirement?

23

4. Does the individual's impairment or combination of impairments prevent him or her from performing any relevant past work?

5. Does the individual's impairment or combination of impairments prevent him or her from performing any other work?

An affirmative answer to question one, or a negative answer to questions two, four, or five, means the claimant is not disabled. An affirmative answer to questions three or five establishes disability. The claimant bears the burden of proof during the first four steps; if the analysis reaches step five, the burden shifts to the Commissioner to show that other work suitable to the claimant is available in the national economy. See Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995); Jolly v. Berryhill, No. 16-cv-38, 2017 WL 3262186, at *6 (E.D. Va. July 13, 2017).

The SSA considers all material evidence in evaluating whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)(3); 404.1520b. This includes "(1) the objective medical facts; (2) the diagnoses and expert medical opinions of the treating and examining physicians; (3) the subjective evidence of pain and disability; and (4) the claimant's educational background, work history, and present age." Jolly, 2017 WL 3262186, at *6 (citing Hayes v. Gardner, 376 F.2d 517, 520 (4th Cir. 1967)). Ultimate responsibility for making factual findings and weighing the

24

evidence rests with the ALJ. Hays, 907 F.2d at 1456 (citing King v. Califano, 599 F.2d 597, 599 (4th Cir. 1979)).

**B.  The ALJ Decision Currently Before the Court for Review.**

At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity from his alleged disability onset date until the hearing date. (R. 25). At step two, the ALJ found that Plaintiff suffered from the following severe impairments: alcohol use disorder; substance induced mood disorder; alcohol use disorder, in remission; major depressive disorder; and generalized anxiety disorder. Id. At step three, the ALJ found that Plaintiff did not suffer from a listed impairment or combinations of impairments that met or medically equaled the severity of one of the listed impairments. (R. 25-27). The ALJ then developed a finding regarding Plaintiff's RFC. (R. 27). She determined Plaintiff was able "to perform a full range of work at all exertional levels, but with the following nonexertional limitations: [t]he claimant can perform simple, repetitive nonproduction pace tasks, with occasional interaction with coworkers, supervisors, and the public." Id. At step four, the ALJ concluded that Plaintiff could not perform past relevant work. (R. 32). At step five, the ALJ found work in the national economy Plaintiff could perform, and therefore found that he was not disabled. (R. 32-33).

**C.    The ALJ's Evaluation of Plaintiff's Mental Health Condition Was Proper and Supported by Substantial Evidence.**

Broadly, Plaintiff takes issue with the ALJ's evaluation of his mental health condition, arguing specifically that the ALJ erred by failing to consider his mental health limitations and improperly evaluating Morrison's medical opinion. Pl.'s Mem. (ECF No. 14, at 5-13.)   The Commissioner argues that the ALJ's evaluation of Plaintiff's mental health limitations and the opinion evidence in the record is proper and supported by substantial evidence. See Def.'s Opp'n (ECF No. 20, at 12-23). Because the ALJ's evaluation of Plaintiff's mental health limitations and Morrison's opinion was appropriate and consistent with SSA regulations, this Report concludes that remand is not warranted, and therefore recommends that the court affirm the Commissioner's decision.

**1.    The ALJ adequately considered Plaintiff's mental health limitations.**

Plaintiff first argues that the ALJ erred by failing to consider Plaintiff's mental health limitations.   Specifically, Plaintiff contends that the ALJ concluded at step three that he was limited in his ability to adapt and manage himself, but never drew any "explicit conclusion" about how those mental limitations "affect his ability to perform job-related tasks for a full workday — a benchmark established by the Administration's own

regulations." Pl.'s Mem. (ECF No. 14, at 7) (citing Thomas v. Berryhill, 916 F.3d 307, 312 (4th Cir. 2019)). In other words, Plaintiff alleges that, "[a]fter finding a limitation in [his] ability to adapt and manage oneself, the ALJ failed to provide a logical explanation of what the Plaintiff's functional limitation in this area would be." Id. In Plaintiff's view, the ALJ's error is evident in her RFC determination, which he claims contains no restrictions relating to his ability to adapt and manage himself. Id. at 7-8.

In response, the Commissioner argues that "[a]n ALJ's finding of impairments at steps 2 and 3 does not require a pre-set corresponding limitation in a claimant's RFC." Def.'s Opp'n (ECF No. 20, at 13) (citing Shinaberry v. Saul, 952 F.3d 113, 120-21 (4th Cir. 2020)). Rather, the Commissioner contends that, when a limitation is not incorporated into the RFC, "the ALJ need only provide a reasonable articulation as to why." Id. The Commissioner believes that the ALJ's decision here "contains a lengthy consideration of Plaintiff's mental impairments and clearly explains whether and why any functional limitations should result in formulating an RFC." Id. at 12. For the reasons explained below, and on the factual record presented in this case, I agree with the Commissioner.

At step three, the ALJ found that Plaintiff was moderately limited in interacting with others; concentrating, persisting, or

maintaining pace; and adapting or managing oneself.  (R. 25-26).
The ALJ explained her reasoning for concluding that Plaintiff was
moderately limited in these areas.   Id.   Regarding Plaintiff's
ability to adapt and manage himself, the ALJ stated that she found
him moderately limited because he reported performing household
chores.  (R. 26).  The ALJ noted that Plaintiff testified he could
"clean up his room and cook a little."   Id.   And although she
recognized that these chores were "minimal," the ALJ emphasized
that Plaintiff did not report "an inability to perform tasks."
Id. (emphasis added).   She also cited Plaintiff's testimony that
he could use the bathroom by himself and tried to exercise
regularly.   Id.   This explanation was sufficient to support the
ALJ's conclusion that Plaintiff was moderately limited in adapting
and managing himself.

     The ALJ then crafted an RFC, which restricted Plaintiff to
"simple, repetitive nonproduction pace tasks, with occasional
interaction with coworkers, supervisors, and the public."   (R.
27).  Plaintiff seems to believe that the restriction to "simple,
repetitive nonproduction pace tasks" corresponds to the ALJ's
finding that Plaintiff was moderately limited in concentrating,
persisting, or maintaining pace, while the restriction to
"occasional interaction with coworkers, supervisors, and the
public" corresponds to the ALJ's finding that Plaintiff was
moderately limited in interacting with others – thereby leaving no

28

restriction in the RFC directly corresponding to the ALJ's finding that Plaintiff was moderately limited in adapting and managing himself.

However, the restrictions in the RFC <u>do</u> account, to some degree, for a limited ability to adapt and manage oneself. An employee with such limitations would likely require a slower-paced position with fewer opportunities for social interaction. As the ALJ explained in the hypothetical she posed to the VE, the restriction to "simple, repetitive nonproduction pace tasks" is meant to exclude "assembly line type work," jobs with "periods of fast-paced work," or jobs in which Plaintiff's production would impact the production of others. (R. 74). These are all reasonable restrictions for an individual who struggles to adapt or manage themself. And in discussing the reasoning behind her RFC determination, the ALJ explained that the RFC "provided for moderate limits in adaptation in light of the claimant's testimony regarding his functioning level at home." (R. 32). That statement clarifies that (1) the ALJ viewed the restrictions imposed in the RFC as accommodating Plaintiff's moderate limitation in adapting and managing himself, and (2) the ALJ declined to impose additional functional restrictions in that area because of "the claimant's testimony regarding his functioning level at home." <u>Id.</u>

Additionally, as the Commissioner points out, "[a]n ALJ's finding of impairments at steps 2 and 3 does not require a pre-

set corresponding limitation in a claimant's RFC." <u>Shinaberry</u>, 952 F.3d at 120-21. In other words, even if Plaintiff is correct that the ALJ failed to include any functional limitations in the RFC corresponding to her finding that Plaintiff was moderately limited in adapting and managing himself, that failure would only amount to legal error if the ALJ failed to explain her reasons for doing so. Here, the ALJ discussed the evidentiary basis for her RFC at length. (R. 27-32). She referenced Plaintiff's mental health and substance abuse treatment, his various diagnoses, his subjective complaints, and his consistently unremarkable mental examination findings. (R. 28-32). She also discussed Plaintiff's testimony regarding his day-to-day activities, noting that he would go on walks with a friend and was capable of cooking, sweeping his room, taking out the trash, calling in his prescriptions, and bathing himself. (R. 27). As stated above, the ALJ specifically explained that, with regards to Plaintiff's moderate limitation in adapting and managing himself, the restrictions in the RFC were imposed "in light of the claimant's testimony regarding his functioning level at home." (R. 32). This explanation sufficiently discharged the ALJ's duty to explain the reasons behind her RFC determination. As a result, I conclude that the ALJ appropriately considered Plaintiff's mental health impairments and the RFC is supported by substantial evidence.

2.  **The ALJ properly evaluated the medical opinion from Plaintiff's psychiatric treating provider.**

Under the applicable regulations,[6] the ALJ does "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s) . . . ." 20 C.F.R. § 404.1520c(a). Instead, the ALJ considers their overall "persuasiveness," id., and while the ALJ may consider many factors in evaluating persuasiveness, he or she must explain only "the most important factors" of "supportability and consistency," § 404.1520c(b)(2). Supportability evaluates whether a medical source supports his or her opinion with "objective medical evidence and supporting explanations," § 404.1520c(c)(1), while consistency evaluates whether "evidence from other medical sources and nonmedical sources" also support the source's opinion, § 404.1520c(c)(2).

When evaluating a medical opinion under these rules, the ALJ cannot "cherrypick[] facts that support a finding of nondisability while ignoring evidence that points to a disability finding." Bilotta v. Saul, 850 F. App'x 162, 169 (4th Cir. 2021) (quoting Lewis, 858 F.3d at 869); see also Apr. R.D. v. Saul, No. 2:20-cv-210, 2021 WL 3260072, at *9 (E.D. Va. June 29, 2021) (recommending

---

[6] On January 18, 2017, the SSA adopted new rules for considering medical opinions and prior administrative medical findings. 20 C.F.R. § 404.1520c. The new rules apply to all claims filed after March 27, 2017. Id. Because Plaintiff protectively filed his claims on March 25, 2020, (R. 217-34), the new rules apply.

remand because the ALJ "selectively cherry-picked unrepresentative evidence"), R. & R. adopted by 2021 WL 3215093 (E.D. Va. July 29, 2021).  Cherry-picking occurs when an ALJ focuses on "a single treatment note that purportedly undermines [the source's] overall assessment of [the plaintiff's] functional limitations . . . ." Hudson v. Colvin, No. 12-cv-269, 2013 WL 6839672, at *8 (E.D.N.C. Dec. 23, 2013) (quoting Punzio v. Astrue, 630 F.3d 704, 710 (7th Cir. 2011)).

Here, when explaining her RFC determination, the ALJ first stated that she "considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 404.1520c and 416.920c."  (R. 27).  Then, assessing Morrison's opinion specifically, the ALJ found the opinion to be unpersuasive because

> the opinion is inconsistent with the progress notes which showed an intact memory.  He had an average IQ and fund of knowledge.  His thought processes were goal directed and coherent.  He did not endorse delusions or hallucinations.  The claimant's symptoms appeared to improve when not drinking and taking his medication as prescribed, although he reported intermittent energy and sleep problems.  He reported problems with social functioning, but attended his medication and therapy sessions, attended AA meetings, interacted well with his friend and mother. He could leave the house and, according to his testimony, enjoyed drives and walks in the park or beach.

(R. 31).

Plaintiff insists that this reasoning is inadequate because the ALJ failed "to analyze consistency and supportability as separate and distinct factors." Pl.'s Mem. (ECF No. 14, at 13). He also contends that the ALJ's explanation is incorrect and not supported by the record. In support of that position, Plaintiff points to Morrison's treatment notes documenting Plaintiff's depressed and anxious mood, as well as his impaired attention span and concentration. Id. at 9. He also highlights Morrison's recordation of Plaintiff's complaints regarding lack of sleep, chronic pain, worry, low energy, lack of motivation, and ineffective medication. Id. at 9–11. Plaintiff argues the ALJ ignored this evidence, choosing instead to cherry-pick favorable facts from the record. Id. at 11–13.

On the other hand, the Commissioner argues that the ALJ's rationale adequately addressed the supportability and consistency factors. Def.'s Opp'n (ECF No. 20, at 21–22). The Commissioner points to the ALJ's discussion of Morrison's treatment notes showing intact memory and normal mental examination findings. Id. She argues that the ALJ, by referencing these treatment notes, "provided specific reasons for her finding that PA-C Morrison's opinion was not supported or consistent with the record evidence." Id. at 22. The Commissioner also disputes Plaintiff's contention that the ALJ cherry-picked the record, arguing that the specific evidence cited by the ALJ is consistent with the weight of evidence

contained in the record.  Id. at 21–22.  Again, I agree with the Commissioner.

The ALJ began her discussion of Morrison's opinion by noting that Morrison found "extreme limits in concentration and pace and the claimant's ability to work with normal stress." (R. 31).  She also noted Morrison found "marked limits in performing even simple tasks and following instructions, as well as in social functioning and in changes to routine."  Id.  Finally, the ALJ mentioned Morrison's opinion that Plaintiff would miss more than four days of work per month due to his condition.  Id.

The ALJ then addressed the supportability and consistency of the opinion as required by 20 C.F.R. § 404.1520c(b)(2), ultimately concluding that the opinion was unpersuasive because it was not supported by Morrison's treatment notes and not consistent with other evidence in the record.  Id. Regarding supportability, the ALJ referenced Morrison's treatment notes indicating that Plaintiff had an intact memory, an average IQ, clear thought processes, and denied delusions or hallucinations.  Id.  Morrison made these unremarkable findings at every appointment she had with Plaintiff.  (R. 460, 468–69, 471–72, 474–75, 477–78, 481, 483–84, 486–87).  The ALJ also highlighted Morrison's notes indicating that Plaintiff's condition appeared to improve when he was not drinking and was taking his medication as prescribed.  (R. 31). Plaintiff himself reported to Morrison on at least five occasions

that his medication was helpful in managing his depression and anxiety, or that he felt better following an increase in dosage. (R. 471, 474, 477, 483, 486).  Regarding consistency, the ALJ referenced Plaintiff's testimony that he interacted well with his friend and mother and could leave the house for drives and walks in the park or beach.  (R. 31).  She also mentioned that Plaintiff attended his medication and therapy sessions and AA meetings, which was recorded in Dr. Mohsin's treatment notes.  Id.; (R. 431, 437). The ALJ's discussion of this evidence demonstrates that she sufficiently considered the supportability and consistency of Morrison's opinion as required by the SSA regulations.

Plaintiff points to numerous other pieces of evidence in Morrison's treatment notes that are supportive of and consistent with the conclusions in her opinion, arguing that the ALJ cherry-picked the record for favorable evidence.  Pl.'s Mem. (ECF No. 14, at 9-11).  However, the facts the ALJ used to discount Morrison's medical opinions were representative of the record as a whole. See Arakas v. Comm'r, SSA, 983 F.3d 83, 99, 102 (4th Cir. 2020) (finding that the ALJ errs when misstating or mischaracterizing facts).  The ALJ thoroughly detailed the medical record in support of her RFC, highlighting numerous pieces of evidence contradicting the conclusions in Morrison's opinion.  (R. 28-31).  For example, she noted that, at his initial appointment with Dr. Kuchibhatla at the RCSU, Plaintiff "said he was not very depressed and did not

feel bad now," and that his sleep and energy levels were fine. (R. 28). She mentioned that, at that appointment and subsequent appointments with the RCSU, Dr. Kuchibhatla, Dr. Posadas, and Dr. Mohsin found Plaintiff's thought processes to be goal-directed and his memory to be intact or fair. (R. 28–29). She also discussed Plaintiff's statement to Dr. Mohsin that he had control over his alcohol. (R. 29).

Regarding Plaintiff's treatment with Morrison, the ALJ highlighted that, at his appointment on September 17, 2020, Plaintiff said he could handle his worry quicker and felt more motivated. (R. 30). She noted Plaintiff's claim from his April 26, 2021, appointment that he "was able to focus okay most of the time." (R. 31). She also explained that, at many of his appointments, Plaintiff reported feeling improved due to his medications. See (R. 30–31). All of these facts — and others cited by the ALJ — corroborate the unremarkable mental examination findings in Morrison's treatment notes that the ALJ used to discount the severe limitations reported in Morrison's opinion. As such, the ALJ did not cherry-pick the record, and her conclusions regarding the supportability, consistency, and overall persuasiveness of Morrison's opinion are supported by substantial evidence.

Additionally, reversal is not warranted simply because the record contains evidence which could support a conclusion opposite

from the one reached by the ALJ. The court must defer to the ALJ's findings if those findings are supported by substantial evidence. Perales, 402 U.S. at 390; see also Lewis, 858 F.3d at 865. This appeal is not an opportunity to relitigate the case. If "conflicting evidence allows reasonable minds to differ as to whether [Plaintiff] is disabled," then the court defers to the ALJ. Craig, 76 F.3d at 589 (quoting Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987)). Because the ALJ's opinion here is supported by substantial evidence, the court does not consider whether the evidence might also support an alternative finding. Thus, there was no error in the ALJ's evaluation of Morrison's opinion and her decision to find the opinion unpersuasive is supported by substantial evidence.

## V.   RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the court GRANT the Commissioner's Motion for Summary Judgment, (ECF No. 19), DENY Plaintiff's Motion for Summary Judgment, (ECF No. 13), and AFFIRM the final decision of the Commissioner.

## VI.   REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.   Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report

is forwarded to the objecting party by Notice of Electronic Filing or mail, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail.  A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof.  See Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

   2.   A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

   The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this court based on such findings and recommendations.  Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).


                                    /s/
                          Douglas E. Miller
                          United States Magistrate Judge
                          _____
                          DOUGLAS E. MILLER
                          UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
January 27, 2023